Holford v. Blatchford, Receiver of the Commercial Bank.

Foreign exchange is a commodity which is bought and sold, like merchandize. The thing sold by the drawer of a foreign bill, is his money or funds abroad, or, what to the payee is equivalent, his credit abroad, equal to cash. The bill of exchange is the instrument of transfer.

From the nature of foreign bills, their sale by the drawer and their transfer by the payee, usually precede acceptance. And whether the contract for the sale of such a bill, be deemed an agreement to draw the bill, or one in respect of the bill already drawn; it is equally the sale of an existing *thing in action,* and legal.

Such a contract stands upon a different footing from one for the sale of promissory notes and inland bills of exchange previous to their being issued or put in circulation. Notes and inland bills are not the subject of sale, except when held by one who can maintain a suit upon them against [the other parties at maturity.

Holford v. Blatchford, Receiver, &c.

Bankers checks and drafts, or inland bills at sight, are in this respect, similar to foreign bills of exchange.

A bill drawn by a house in New York on a house in London, the partners in both houses being the same persons, is the legitimate subject of sale in the hands of the drawers.

A commercial house in New York drew their bills of exchange, on a house in London, and sold them on a credit, to the payees, before acceptance, for a price which was 2½ per cent. beyond the then current price of exchange between New York and London. There was no allegation that it was a loan, or a cover for a loan.

Held, that the transaction was not usurious. The charge of one and a half per cent. beyond the cash price of the exchange, did not make the transaction usurious.

On an application to purchase foreign bills, on credit, the drawer demanded nine and a half per cent. premium, one per cent. commission, and interest on the whole till paid. Held, on the testimony, that the commission was a part of the stipulated price of the bills, and was not to be deemed a compensation for forbearance or giving day of payment, and that the contract was not usurious.

If the commission had been included for forbearance, quære whether it should not be construed as two distinct contracts: 1. For the sale of exchange at 9½ per cent. premium; and 2. An agreement to forbear payment of the price for sixty days, in consideration of the legal interest and one per cent. commission?

The bill set forth a sale of exchange at the current rate, for the price of which, a certificate of deposit was given. The suit was for the recovery of the price, and the proof showed that the sale was made for 1½ or 2½ per cent. more than the current rate of exchange. The certificate having been given for the amount at that rate: Held, that there was no variance between the bill and the proof.

Where the answer states a contract as a sale and purchase of foreign exchange, without any averment that it was a cover for a loan, or that there was an application for a loan which assumed the form of a sale, the defendant cannot prove those facts, or insist upon them, although he has inserted a general allegation that the contract was usurious.

September 23, 24, 25; October 3, 1844.

THE bill was filed by Holford, Brancker & Co., merchants in New York, to recover of the receiver of the Commercial Bank, the price of certain bills of exchange for 8000l. sterling, drawn by themselves on Holford & Co., bankers in London, in March, 1841.

The bank gave a certificate of deposit for the price of the bills, including 9½ per cent. for the premium of exchange, and one per cent. for commission. The certificate was payable on demand, but by agreement, was to be paid in sixty days, with interest.

At the end of four months, the bank made a payment on account, and gave a new certificate for the balance, in which was

included a commission for forbearance. The same thing was repeated in September, 1841.

The defence was that these transactions were void for usury.

The answer alleged, that the application for the bills was originally made to the complainants by the North American Trust and Banking Company, and the same terms agreed upon; but in consequence of the complainants rejecting the securities offered, the Commercial Bank stepped in and obtained the exchange for the Trust and Banking Company, receiving the securities from the latter, and giving their own certificate to the complainants for the stipulated amount. That the stipulation was for a premium of $9\frac{1}{2}$ per cent., which was $1\frac{1}{2}$ per cent. beyond the current rate or market price of exchange at that time, besides the exaction of a commission of one per cent.; and the certificate was given for the aggregate amount, and interest was to be paid for the time it was to be forborne.

The answer also insisted that the excess above the market price, was charged by the complainants with the intent to evade the statute against usury, and at the same time to secure more than seven per cent. interest on the loan or forbearance of money. The same allegation was made in respect of the commission. Some other points of the pleadings and evidence will be found noticed in the opinion of the court.

*J. Prescott Hall* and *George Griffin*, for the complainants.

*E. H. Blatchford* and *B. F. Butler*, for the defendant.

THE ASSISTANT VICE-CHANCELLOR.—The contract upon which the complainants claim a decree, is not very fully stated in the bill; but so far as the particulars are given, I do not think that they are substantially variant from the contract proved.

The bill sets forth a sale of the complainant's bills of exchange on the house of Holford & Co., London, for £8000 sterling, at the then current rate of exchange, and that they received the certificate of deposit of the bank *for the price* of such bills of exchange.

The objection is that the sale proved, was at the rate of $9\frac{1}{2}$ per

cent. premium, whereas the current cash rate of exchange was only eight per cent. ; and besides this excess of premium, the complainant's contract as proved, included interest at the lawful rate for the term of credit given, and a commission of one per cent. for the forbearance of payment during that term.

Whether there was a commission included in the original contract, is a disputed fact which I will consider presently. I do not think it material on the point of variance.

The allegation of a sale of bills of exchange, or of any other article, at the current rate or price, is not definite or certain, because the current price is almost universally to be found between two limits. Thus, on the day that I am writing, exchange on London is quoted at $9\frac{3}{4}$ to 10 per cent. premium. But a statement that bills were sold and a certificate of deposit given for their price, is definite, and by reference to the certificate, absolutely certain.

In this bill, therefore, the most material statement, as to the sum which the bank was to pay the complainants for the bills, is that relating to the certificate. The expression, " then current rate of exchange," is not set forth as the terms or very language of the contract. It is descriptive of the price, and is subordinate to the more definite description which is given by reference to the certificate. In applying the proof the latter must control, and thus applying it, there is no variance.

If there were a variance, it will not affect the defendant's right ; inasmuch as there is no surprise in the case, and the court would permit the complainants to amend their bill upon terms, so as to obviate the defect ; as was directed in the case to which I was referred by the defendant's counsel. (*Harris* v. *Knickerbacker*, 5 Wend. 638.)

The defence which has been interposed in the discharge of the defendant's duty to the creditors of the Commercial Bank, is that the original certificate, and the contract on which it was given, were usurious.

And 1. It is urged that the object of all the parties, was to enable the bank to raise money for the benefit of themselves and the North American Trust Company : That the transaction was a loan in disguise.

As to this ground of the defence, I am spared the necessity of examining it, because it is not set up in the answer. I find no allegation in either the first or the supplemental answer, that the original transaction was a loan, or a cover for a loan; or that there was any application for a loan, made by the North American Trust Company, or the Commercial Bank. The answers speak of a sale and purchase of bills of exchange. They present as a defence, that the transaction was made for the North American Trust Company, without any authority on the part of the officers of the bank who assumed to act, and that the complainants had notice of the defect of authority. That for the forbearance of the debt, or price of the bills of exchange sold, the complainants exacted $2\frac{1}{2}$ per cent. beyond legal interest, of which $1\frac{1}{2}$ per cent. was under the garb of the premium for the exchange, and one per cent. was called commission. And that upon the renewals of the certificates, there was a further exaction of unlawful interest.

But the answers do not allege, that there was any loan solicited or made.

I am limited to the issues made by the pleadings in the cause, and must lay out of view the first ground presented by the defendant's counsel at the hearing.

2. The next objection to the transaction, is that the complainants bills in their own hands, had no legal existence, and could not be the subject of sale; and it was therefore a mere exchange of credits, and the taking of $1\frac{1}{2}$ per cent. (or $2\frac{1}{2}$ per cent. if the commission were included,) above the current rate of exchange and in addition to the legal interest, was *per se*, usury.

The Dunham cases were referred to, to show that where on an exchange of notes, the party loaning his credit, reserves a commission exceeding the lawful interest, the transaction is usurious. (13 Johns. 40; 16 ibid. 367; 5 J. C. R. 122.) And it was contended that a bill or note cannot be the subject of sale, unless it be such a security in the hands of the seller that he could maintain a suit upon it at maturity. This distinction is well settled in regard to promissory notes. (*Powell* v. *Waters*, 8 Cowen, 689; *Cram* v. *Hendricks*, 7 Wend. 569.)

In *Munn* v. *The Commission Company*, 15 Johns. 44, the

same distinction was applied by the Supreme Court to an inland bill of exchange.

All these were cases of the discounting of notes and bills ; the advance of money by the purchaser to the seller or borrower. And the real point to which this distinction was addressed, was to ascertain whether the transaction was a loan on paper made for the purpose and then first used, or whether the paper was previously in existence and operative. In other words, whether it were in fact, a loan, or a sale. It might be a loan, although the person discounting the note supposed he was buying a business note, as is shown in *Powell* v. *Waters.*

I think that this distinction is not applicable to the sale of foreign exchange. The contract in this instance was, in truth, an agreement by the complainants to draw foreign bills for £8000, in consideration of which the Commercial Bank agreed to pay them the stipulated amount, whether that were $9\frac{1}{2}$ per cent. premium and a commission, or $9\frac{1}{2}$ per cent. without the commission. And the drawing of the bills was a part performance of that agreement.

Both in theory and practice, the contract was complete in all its parts, before any bill of exchange was drawn.

Then what was sold ? The answer is, Holford, Brancker & Co.'s agreement that Holford & Co. would pay to the Commercial Bank, £8000 sterling in the city of London, at the end of sixty days after presentment, and that Holford, Brancker & Co. would deliver to the bank, the usual medium of transferring exchange, viz. their bills on the London house. The thing sold was money or funds in London. The bills were the instruments of transfer.

But it may be asked, wherein does this differ from an agreement by which A. is to obtain B.'s note for $100 at six months, and deliver it to C. for $90, or any other price? I answer that a note is a promise to pay a fixed sum, and whether paid at maturity or not, no additional sum can be demanded upon it.

Foreign exchange is an undertaking by the drawer in one country that a person in another country shall pay money there at a time stipulated ; and if the latter fail to pay, subjects the drawer to heavy damages, in addition to the amount designated in the bill.

Holford v. Blatchford, Receiver, &c.

So when a note is drawn and delivered, the maker is liable simply for its amount, and ultimately at the place where he resides. When a foreign bill is drawn and delivered, the drawer is liable to provide for its acceptance and payment abroad, or to pay its amount at home with the damages added.

A contract to make a promissory note and sell it at a stipulated price is not the subject of traffic in the market.

But a contract for the sale of exchange on a foreign town at a rate agreed upon, is a familiar mercantile transaction. It is a commodity which is bought and sold like merchandize, and in all large cities a distinct class of merchants is usually devoted to this branch of commerce. In this instance the exchange sold, whether considered before the bills were drawn, or after they were signed but while they still remained in the hands of the complainants, was in existence and was the subject of sale. It was either funds of the drawers in London, or their credit at that place equivalent to cash.

The circumstance that the drawer of the bills in question was one of the partners in the drawee's house, cannot affect the point in reference to their legal existence while in the drawer's hands. They would have been in the same plight, if drawn upon another and distinct firm.

From the nature of foreign exchange, it must be sold and remitted, in the usual course of trade, before it is accepted. It therefore performs all its functions in the country where it is drawn, before it receives the signature, and thereby the liability of the party who is in theory the real debtor in the transaction. I refer to its acceptance. In its legitimate operation it is frequently sold but once. The merchant having occasion to pay money in England, applies to a banker here who deals in exchanges, buys his bill on a banker in London, which the merchant remits directly to his creditor in England, who in due course, obtains the acceptance of the London banker. To say of this transaction, that the bill or the exchange, had no legal existence when it was sold by the banker here, appears to me to be entirely erroneous.

This question has been decided in this circuit, and by authority which would control me unless my judgment was clearly at variance with the decision. If I were merely in doubt, I should

feel bound for the sake of uniformity in the administration of justice by co-ordinate tribunals, to follow the authority of my predecessor and the Vice-Chancellor.

My conclusion coincides fully with theirs. In *Manice* v. *The New York Dry Dock Company*, 3 Edw. Ch. R. 143, the Vice-Chancellor held that bills of exchange in the hands of the drawers, were the legitimate subjects of sale. The same decision was made by my learned predecessor, when that case came before him for a final hearing on the merits. (See 3 Edw. 152, note *a*.)

A similar decision was made by the very learned and venerable Chief Justice of the New York Superior Court in the case of *De Launay* v. *Manice*, which is not reported. And that was an instance in which the drawers in this city, and the drawees in France, were the same persons, having mercantile houses in both countries.

The same judge, when Chancellor, delivered the leading opinion in the Court for the Correction of Errors in *Powell* v. *Waters*, and he there commented on *Munn* v. *The Commission Company*, which was the only instance of an inland bill having been subjected to the rule as to promissory notes which have not been negotiated. It is evident, from his decision in *De Launay* v. *Manice*, that this great jurist when deciding *Powell* v. *Waters*, did not imagine that a foreign bill of exchange was to be brought within the distinction there taken.

The inland bills of exchange on time, which are in use among us, partake of the character of both loan and exchange. When legitimate, they are drawn in anticipation of funds which are to result at the place of payment, from future sales of produce or the collection of debts there; and are put in circulation to be discounted, and thus to furnish the drawers with the funds in advance of such sales or collections.

These bills are of course unlike foreign exchange. But there is another class of inland bills which are in this respect entirely analogous to foreign bills. I allude to the bills of exchange of the country banks and bankers, usually called bank drafts, which are drawn on their funds in the cities on the seaboard, payable at sight, or some few days after sight, and sold at a premium for the purpose of remittance.

In the *Cayuga County Bank* v. *Hunt*, 2 Hill, 635, the Su·preme Court recognized the legality of this very common trans-action, where the bills sold were paid to a borrower, in lieu of cash, on a discount of his securities. And see *Merritt* v. *Benton*, 10 Wend. 116.

The same principle will uphold the sale in question, as being a sale of an existing thing in action, whether it be regarded as an agreement for exchange, or a bill of exchange already drawn up. I must therefore decide against the second point made in the defence.

3. The next objection is, that admitting the bills of exchange to be a subject of sale, yet the complainant's exaction of one and a half per cent. beyond the current rate of exchange, besides interest on the aggregate amount of the bills and the premium taken, was a mere colorable device to obtain more than lawful interest for the forbearance of the price of the bills during the stipulated term of credit.

On this point the decisions in the case of *Manice* v. *The Dry Dock Co.* before cited, are decisive against the defendant.

Under the pleadings, I am to treat the contract as a sale merely, and it would be extravagant to hold that the charge of $1\frac{1}{2}$ or $2\frac{1}{2}$ per cent. beyond the cash price on a sale of exchange on credit, in addition to interest on the price, was a device to cover usury.

It is true the witness who was examined to the point, places the enhanced charge in such cases on two grounds only, viz.: the doubtful standing of the purchaser, and the probability of a rise in the value of exchange ; and as to the first, it is proved that the bank was in good standing at the time of the sale, and there is no evidence of increase in the value of exchange being then probable.

But the well known difference between the cash and credit price on the sale of merchandize, does not rest wholly upon these grounds. Although the purchaser may be in perfectly good credit, the vicissitudes of trade may overtake him before the term of credit will expire. Whereas on a delivery of the goods, and the receipt of the price in money, there is no risk of loss ; and in reference to a rise in the value of the article, the

seller may with the price received, replace it by another purchase.

Accordingly it is notorious that the difference in price on a cash and credit sale, almost invariably exceeds the amount of the interest on the price during the stipulated credit. The deduction of *five per cent. for cash*, has acquired nearly the force of usage in many branches of trade.

Assuming that the difference between the cash price and credit sale in the case before me was $2\frac{1}{2}$ per cent., which would include the commission, it was no more than the usual charge of a factor for guaranteeing the sale of goods. And probably no more than the complainants would have been compelled to pay, if they had obtained a responsible guaranty of the payment of their first certificate from a third person.

The enhanced price of the bills of exchange cannot for these reasons be deemed a colorable device for usury.

4. There is still another objection to the validity of the transaction, which was pressed with much force.

It was said that the proof is conclusive that in addition to the $1\frac{1}{2}$ per cent., the alleged difference between the cash and credit price of exchange, the complainants took for the forbearance of the price a commission of one per cent.: That the price of the bills became a debt which was forborne, and for the forbearance of which more than lawful interest was taken; and that the contract is therefore usurious, even if it be regarded as involving a sale of exchange.

The fact, whether the commission formed a part of the first certificate of deposit, is involved in much doubt and contradiction; and before looking into it, I will inquire whether assuming that the commission was agreed upon at the time of the sale, it does of itself, or under the circumstances, render the transaction usurious.

*First.* I think it may be safely asserted that if the commission were a part of the price of the bills, usury cannot be predicated of it. There being a sale, and not a loan, it is only in respect of the forbearance, that the charge can be deemed illegal.

The testimony, (including the statement of Mr. Brancker to his clerk, which the defendant's counsel finally resorted to,) es-

tablishes that the premium charged on the bills was $9\frac{1}{2}$ per cent.
And there is no dispute but that interest was to be paid on the
aggregate sum included in the first certificate.

On the other hand, Mr. Strong, the president of the bank, who
negotiated the purchase of the bills, testifies distinctly, that if a
commission were charged on the sale, and included in the first
certificate, it was a part of the original contract of sale of the ex-
change; that the amount expressed in the first certificate was
the price which the bank agreed to pay for the exchange at the
end of sixty or sixty-three days from the time of the purchase;
and that they agreed to pay that amount as the price of the ex-
change.    At first I was inclined to look upon the £8000 reduced
to federal currency, with $9\frac{1}{2}$ per cent. added thereto, as *the price*
of the exchange, properly so called ; and to rank the commission,
(if any were then agreed upon,) with the interest stipulated, as
the price of the forbearance.    But upon further consideration, 1
think that the commission is to be deemed a part of the price of
the exchange.

It was a sale of the bills on a credit.    When the application was
made by the purchaser, the terms given were, $9\frac{1}{2}$ per cent. pre-
mium, 1 per cent. commission, and interest on the whole till
paid.    These terms, then, were the price which the sellers asked
for their bills.    If they had asked 12 or 13 per cent. by the name
of premium, besides interest, the case of *Manice* v. *The Dry Dock
Co.* shows that it would have been lawful.    I do not perceive
how it can be any the less legal, because they asked $9\frac{1}{2}$ per cent.
by the name of premium, and 1 per cent. by the name of com-
mission.    Certainly, the names imposed, cannot affect the merits
of the contract, so long as it appears that the thing which they
represent was the price of the article sold.

The case of *Beete* v. *Bidgood*, 7 B. & C. 453, (1 Mann. & Ry.
143, S. C. where the facts are reported more at large,) is also an
authority for the complainants.    There a contract was made by
Beete and Newton, residing in London, for the sale of the undi-
vided half of an estate in Demarara.    It was recited that Beete
had agreed for the absolute sale, &c., to Newton, "at and for
the price or sum of 16,000*l.* sterling money, &c., being the bal-
ance of an account stated between them : which said sum of

16,000*l.* together with *interest* upon the several promissory notes added thereto for the time they have to run, and which are written at the foot," &c. &c., "are to be in full of the said purchase money;" and that Newton had agreed to purchase the property, "at and for the said price of 16,000*l.* to be paid at the times, including the said interest to be added thereto by the instalments, and in the manner specified in the said several promissory notes," &c. At the foot of the contract; Beete signed a receipt acknowledging to have received of Newton the seven notes thereinafter mentioned, "being the amount of the said sum of 16,000*l.*, the money agreed upon for the said purchase," &c., "together with the *interest* on the said sum of 16,000*l.* added thereto for the time the respective bills have to run, *making in the whole, principal and interest*, 20,000*l.*"

Then followed the seven notes, upon one of which the suit was brought. The interest computed in the several notes was at the rate of six per cent. per annum, being the legal interest of Demarara. The defence was that the contract was usurious; and it was urged that the consideration was 16,000*l.*, and was so stated; the six per cent. was expressly called interest, not purchase money, and the parties treated the 16,000*l.* as principal, and the residue as interest.

The court decided that there was no usury. Lord Tenterden said, that the agreement arose out of a contract of sale, not out of a contract of loan; though the parties have calculated the price partly in what they considered the value in present money, and partly in money to be paid at a future day. That the whole difficulty was created by their calling the difference "interest." If they had said, "payable by instalments," there would have been no doubt. It was the duty of the court to look not at the form and words, but at the substance of the transaction. And that in substance this was a contract for the sale of the estate at the price of 20,800*l.*, (the aggregate amount of the seven notes,) to be paid by instalments.

It will be perceived that the court in *Beete* v. *Bidgood*, construed the transaction in spite of the words used, to be in effect what Mr. Strong testified the contract was in this case; and the

" interest" there, like the " commission" here, was a part of the price.

This case was cited with approbation by the majority of the court in *Ketchum* v. *Barber*, 4 Hill, 224, 228.

In *Floyer* v. *Edwards*, Cowp. 112, the sale was on three months credit, with an agreement for more than the legal interest, after that time, if the price were not then paid. This was held not to be usurious. At the trial some stress was laid upon an usage proved; but Lord Mansfield did not rely upon it in his decision, further than to show that there was no intention to cover a loan.

It is undoubtedly true that the charge of commission, as well as the whole machinery of the sale of the bills, may have been colorable, and mere devices to evade the loans against usury.

Where the question is presented by the issue, it is often difficult to ascertain whether the transaction were in truth a sale or a loan in disguise. Such were the cases of *Doe* v. *Brown*, Holt's N. P. Rep. 295, and *Glover* v. *Payn*, 19 Wend. 518.

These cases however show, that where the contract was clearly a sale, it cannot under circumstances like those before me be adjudged usurious. And such must necessarily be my conclusion here, where the transaction is brought forward as a sale.

*Second.* If I have erred in holding that the commission should be regarded as a part of the price, there is still another view which deserves consideration.

The transaction may then be construed as two distinct contracts; first, a sale of the bills at $9\frac{1}{2}$ per cent.; and second, an agreement to forbear payment of the price for sixty days on the payment of legal interest and one per cent. commission.

In that view, the case would be like those of *Pollard* v. *Scholy*, Cro. Eliz. 20; and *Evans* v. *Negley*, 13 Serg. & Rawle, 218.

The former was a sale of oxen, and an agreement by the buyer to pay more than legal interest for the forbearance of the money for a longer day. The agreement for the interest was held void, but the sale was good.

In *Evans* v. *Negley*, the parties as partners had erected a mill, and soon after it went into operation, Evans sold his half to his partner. The contract between them provided that the price

should be $8500, to be paid when it should be convenient, and in the mean time the purchaser was to pay to Evans " a *yearly rent*," of $640. Any part of the purchase money which might be paid, was to abate the rent *pro tanto*. The mill was to be conveyed immediately. The agreement for the rent was held to be usurious, it being in effect interest reserved for the forbearance of the purchase money. But Evans recovered upon the covenants for the $8500. The contract of sale was thus distinguished from the contract for forbearance, and relieved from the taint of the latter.

In fine, I am satisfied that there was no usury in the transaction in question, although the commission formed a part of the original agreement, and was included in the first certificate. It is therefore unnecessary for the decision of the points raised, to determine whether such were the fact, or whether as the complainants insisted, the commission was first brought forward in July, 1841.

There is no doubt but that the renewals of the debt, and the second and third certificates were usurious. These however do not affect the original sale, on which alone the complainants claim to recover.

There must be a decree for the contract price of the bills, with interest and the costs of suit. The two payments made on the renewals will be applied in reduction of the amount of the debt.

[On settling the decree, the Assistant Vice-Chancellor looked into the testimony, and decided that the commission of one per cent., as well as the premium of $9\frac{1}{2}$ per cent. was included in the first certificate, and the decree was made accordingly.]