ALBANY,
January, 1818.

MUNN
v.
COMMISSION
Co.

MUNN *against* The President and Directors of the COMMISSION COMPANY.

*A corporation, authorized by the act of incorporation to employ their stock solely in advancing money upon goods, and the sale of such goods upon commission, may lawfully accept bills drawn on account of future consignments, or deposits of goods.*

*The principal is liable for the acts of a general agent, acting within the general scope of his authority; and a third person cannot be ... ted by any private instructions from the principal to his agent.*

*But the principal is not bound by the acts of a special agent beyond his authority.*

*A company, incorporated for the purpose of selling goods, on commission, is bound by the acceptance of its general agent of a bill, drawn on the company, on account of goods,* stipulated to be deposited with the company, for sale on commission.

*Where a bill or note is valid, as between the drawer or maker, and the payee, so that the latter can maintain an action upon it, against the former, it is valid in the hands of an endorsee, who has discounted it at a higher rate than the legal rate of interest, and he may recover the full amount of the bill, or note, against the maker or acceptor.*

*But the holder of a note, purchased at a discount greater than the legal rate, can only recover from his endorser the sum which he actually advanced.*

*A bill, or note, drawn for the purpose of being discounted, at an usurious rate of interest, and endorsed for the accommodation of the maker, or drawer, is void in its original formation.*

THIS was an action of *assumpsit*, on a bill of exchange, drawn by *Herman Ruggles*, in favour of *Oliver Ruggles*, or order, on *Noyes Darling*, as agent of the defendants, dated the 26th of *April*, 1814, at sixty days after date, for 4,500 dollars. The bill was accepted by *Darling*, as agent, and was endorsed by *Oliver Ruggles*. The plaintiff was the holder of the bill. The cause was tried before Mr. J. *Platt*, at the *New-York* sittings, in *December*, 1815.

By the second section of the act of *April* 9th, 1813, (sess. 36. c. 150.) by which the defendants were constituted a corporation, it is, among other things, enacted, that the stock of the company " shall be employed solely in advancing money, when requested, on goods and articles manufactured within this state, or the *United States*, except salt manufactured within the same, and the sale of such goods and articles on commission : *Provided*, That no more than lawful interest shall be charged or received for any money so to be advanced, and that the usual mercantile commissions, with the usual charges, shall be charged or received on such sale, and that no commissions be charged or received, except upon actual sales : *And provided also*, That it shall not be lawful for the said corporation to use or employ any part of the said capital, nor any money, funds, or effects whatsoever, in the purchase or sale of any goods, wares, merchandise, or commodities whatever, other than, and except in advances in money, on *American* manufactures, and selling the same on commission as aforesaid, nor in banking, or in

any monied operations, nor in the purchase or sale of bills of exchange, or any stock, or funds, of this state, or the *United States*, except in selling the same, when truly pledged to the said corporation, for a debt, or debts, due to the same."

By the by-laws of the company, an agent was directed to be appointed, whose powers and duties are thus defined; " the agent will be required to superintend, generally, the business of the company; to make contracts, both for advances and sales, under such directions as the board may give, from time to time; to sign checks for the cash payments of the company, which are all to be countersigned by the secretary, and to countersign all obligations which may be signed by the president, with the seal of the company; to lay before the board statements of the affairs of the company, when required, and especially, at each regular monthly meeting of the directors, to give a full and particular statement of the whole business of the company." Shortly after this by-law was passed, a committee of the directors made a report, in relation to the duties of the agent, which was accepted by the board on the 17th of *May*, 1813, the most material parts of which are as follows: " The committee do not deem it expedient to publish any proposals for the transaction of business, excepting that they will receive on consignment goods of *American* manufacture, and will make reasonable advances on the same, charging the customary commissions and expenses. They deem it expedient, however, to adopt certain rules for the guidance of the agent, who will make known such parts of them as are proper to individuals proposing to transact business with the company. 1. The agent is authorized to receive on consignment all goods of *American* manufacture, and to make advances on the same, not exceeding three-fourths of the market value of such goods, and requiring a receipt for the advance, with promise to refund, with interest, in case the goods should not be sold within a limited time, not exceeding one year, or should be insufficient to meet the advance. 2. The agent, with the advice of a monthly committee of two directors, may make arrangements with individuals, or manufacturing companies, for the general consignment of

their manufactures.    3. The agent, with the advice of the same committee, may make reasonable advances on shipments of *American* manufactures.    4. The agent shall not make any other appropriation of the funds of the company, without the order of the board of directors, except the current expenses of the company, and balances due for sales. 5. The agent may agree to transact business on the following terms, &c. &c.   The preceding regulations are deemed to be sufficient restrictions on the agent, whose general duties are pointed out, in the report made to the directors, on the 26th of *April*," (the material part of which was the by-law above stated,) " with which he is expected to comply." *Darling* was appointed the agent of the company, and was at the same time one of its directors.

At the time that the acceptance in question was made, *Herman Ruggles* gave *Darling* a receipt, stating the terms of the agreement entered into between them, and dated the 26th of *April*, 1813.    This receipt was as follows : " Received of *Noyes Darling*, agent of the commission company, his acceptance of my draft in favour of *Oliver Ruggles*, at sixty days from this date, for 4,500 dollars, which acceptance is wholly for my accommodation ; and which I hereby agree to return to said *Noyes Darling*, to be cancelled, on the 2d day of *May* next, or to pay him the amount of said acceptance, on said 2d day of *May*, and, as collateral security, for the return or payment of said acceptance, on said 2d of *May*, I have placed, and do hereby place, in the hands of said *Darling*, my three several notes of hand, &c.   And I do agree, in consideration of the accommodation afforded by the commission company, to place in the hands of their said agent, for sale on commission, one month from the date hereof, 100 hogsheads of domestic distilled spirits."   *Ruggles* neither paid the amount of the bill, nor delivered it up, nor were the spirits deposited pursuant to the agreement.

An entry of this acceptance was made in the bill book of the company by their secretary, and it was offered for discount, at the *Merchants' Bank*, where it was refused. *Ketchum*, a broker, testified, that, in *April*, 1814, he received the bill from *Oliver Ruggles* to raise money upon.   The broker took the bill to *Fox & Leggett*, and offered it to them

for sale ; they retained it, under the pretence that they wish-
ed to examine into the state of their funds, and in the mean
time gave it to another broker, *Franklin,* who sold it to the MUNN
plaintiff for 4,362 dollars 75 cents, and paid the money to COMMISSION
*Fox and Leggett*; out of this money they paid over to Co.
*Ketchum* the amount of the bill, deducting discount at a
higher rate than had been taken by the plaintiff, and so
making a profit on the transaction. *Ketchum* paid over the
money which he had received, to *Oliver Ruggles.* It was
proved that *Darling* had accepted a number of bills, in the
same manner as the one in question, which were regularly
paid by the company, but there were some acceptances
which were never entered in the company's books, and the
funds arising from them had never come into their hands.

The president of the company was a director of the *Mer-*
*chants' Bank,* and was present when the bill was offered for
discount, and a few hours after caused a meeting of the di-
rectors of the company to be called, to inquire into the
transaction ; but, at the request of *Darling,* the business was
postponed. On the 2d of *May,* when another meeting of the
company was called, there was not a sufficient number pre-
sent to form a board, and the next day *Darling* absconded.
The company afterwards settled and compromised ac-
ceptances of *Darling,* which had not been entered in their
books, for the purpose of preserving their credit.

At the trial, *Herman* and *Oliver Ruggles* were offered by
the defendants as witnesses, to prove that no rum had
ever been deposited with the company, pursuant to the
agreement, and that the bill was, in its inception, usurious;
but they were rejected by the judge. A verdict was taken
for the plaintiff, by consent, for the amount of the bill, with
interest, subject to the opinion of the court, on a case, of
which such parts as appeared material are above stated.

The cause was argued, at a former term, by *Wells* and
*Hoffman,* for the plaintiff, and by *T. A. Emmet,* and *D. B.*
*Ogden,* for the defendants, on the two points raised by the
counsel for the defendants, to wit : 1. That the defendants
were not bound by the acceptance of the bill by *Darling.*
2. That the transaction was usurious. At the last *October*
term, the court directed a second argument, on the second
point.

*Arguments for the plaintiff.* 1. Whatever may have been the law formerly, it is now well settled, that a corporation may be bound by a contract, made by their authorized agent, *without their seal;* and that an action of *assumpsit* lies against a corporation. (*Stafford* v. *Albany,* 6 *Johns. Rep.* 1. *Danforth* v. *Schoharie Turnpike Company,* 12 *Johns. Rep.* 237. 10 *Mass. Rep.* 295.) It is fully proved, by one of the witnesses, (*Jennings,*) that *Darling* was the general agent of the defendants, and was in the habit of accepting bills for them, and that his acceptances had been regularly paid by the defendants. It may be said, perhaps, that the defendants, by the act for their incorporation, (sess. 36. ch. 150. s. 1, 2.) had no authority to accept bills; but were restricted to making advances of money, on goods sent to them for sale. Though the *preamble* speaks of advances on the deposit of goods, yet the enacting clause is silent on that point, and the practice of the company had been different. They have not required the actual deposit of goods before making advances. The acceptance of a bill is nothing more than an agreement in writing, to advance money on a certain day specified in the bill. It is enough, that the acceptance was in the ordinary course of the defendants' business. The object of the act was merely to give the defendants, as a corporation, the power to transact business as commission merchants. An actual deposit, or a reasonable expectation of a deposit of goods, on a certain day, was sufficient to authorize the acceptance to advance the money.

The whole evidence goes to show that *Darling* was the *general agent* of the defendants; and he proves, also, that he acted within the scope of his authority or instructions. But whether he did so act or not, yet being the general agent of the defendants, his acts are obligatory on them. The particular instructions given to him for the regulation of his conduct may make him accountable to his principals; but the public, or third persons, are not bound to inquire into his authority; they know him only in his ostensible character as a general agent. To require that all persons dealing with such an agent should ascertain the extent of his power, would destroy all distinction between a general and

special agent, and would render it unsafe to take even a bank note, without inquiring whether the president and cashier of the bank had any authority to sign it. It is enough that the general agent acts ostensibly within the scope of his authority. This doctrine is more especially applicable to corporations, who can act only by their agents. The distinction between general and special agents is well settled in the books. (*Fenn* v. *Harrison*, 3 *Term Rep.* 757. *Whitehead* v. *Tuckett*, 15 *East*, 400. *Runquist* v. *Ditchell*, 3 *Esp. N. P. Cas.* 64, 65. *Batty* v. *Caswell*, 2 *Johns. Rep.* 48. *Gibson* v. *Colt*, 7 *Johns. Rep.* 390. *Pothier, Trait. des Oblig.* n. 79.)

Again, on principles of the *commercial* law, the acceptance is binding, whether *D.* exceeded his instructions or not. This being a negotiable paper, the plaintiff, a *bona fide* holder, is not to be affected by any fraud committed in putting it into circulation. (*Woodhull* v. *Holmes*, 10 *Johns. Rep.* 231. *Peacock* v. *Rhodes*, *Doug.* 633.) Admitting, however, that *D.* exceeded his authority, yet the defendants have recognised and adopted his acts so as to give them validity. Where a principal is informed of the acts of his agent, and does not, in a reasonable time, express his dissent, he is presumed to assent to them, and will be bound by such implied adoption. (*Cairnes* v. *Bleecker*, 12 *Johns. Rep.* 300. *Hodgson* v. *Davies*, 2 *Camp. N. P. Cas.* 530.)

2. As to the objection of *usury*. To avoid an instrument, on the ground of usury, it must be shown that it was, in its inception, founded on an usurious loan of money. (*Scott* v. *Brest*, 2 *Term Rep.* 241.) Any subsequent taint which it may, afterwards, acquire, in being negotiated between third persons, will not destroy the original contract. The original party, maker, drawer, or acceptor, cannot object that there has been a subsequent usurious contract between the endorser and endorsee. Then, was not this a valid bill in its inception? It was advanced on an hypothecation or deposit of goods by *O. Ruggles.* There was no actual or implied agreement that the acceptance should be taken or used for the purpose of raising money in the market on usury. There were 400 shares, also, deposited as collateral security, *O. R.* might have brought an action on the bill

ALBANY,
January, 1818.

MUNN
v.
COMMISSION
CO.

against the defendants; and if *H. R.* could not, it would be on the ground only, that he had engaged to return the acceptance lent to him. The term *accommodation* does not imply usury. If the bank had discounted the acceptance when it was offered for that purpose, they might have recovered the amount of the defendants. *O. R.* the payee, put the bill in circulation. He had a right to sell or negotiate it, at any rate of discount he pleased. The defendants cannot object to such a negotiation of it. It is enough that the bill was made and issued *bona fide*, without a premium paid, or usurious .agreement. The cases of *Jones* v. *Hake*, (2 *Johns. Cas.* 60.) and *Wilkie* v. *Roosevelt*, (3 *Johns. Cas.* 206.) are very different from the one before the court. There, a note was made and endorsed for the very purpose of raising money on it, at an usurious interest. It passed directly from the maker to the lender or endorsee, without having been delivered to the payee or endorser.

Again, after the bill came into the hands of the plaintiff, the defendants promised to pay it. A contract originally usurious may be made good in the hands of a *bona fide* holder, by a promise to pay him the amount. (*Stewart* v. *Eden*, 2 *Caines' Rep.* 150. *Jackson* v. *Henry*, 10 *Johns. Rep.* 185. *Cuthbert* v. *Haley*, 8 *Term Rep.* 390. *Parr* v. *Eliason*, 3 *Esp. N. P. Cas.* 210. *Prodgers* v. *Lugham*, 1 *Sid.* 133. *Ferral* v. *Shaen*, 1 *Saund.* 294.)

*Arguments* for the *Defendants.* 1. To make the acceptance binding, it must appear to have been made by the defendants in their corporate capacity, or by their agent duly authorized ; and such acceptance must be within the corporate powers of the defendants. The acceptance was made for the accommodation of *H. R.* who made no deposit of goods at the time, but merely promised, in consideration of such accommodation, to deposit them at a future time. The defendants are trustees for the stockholders, and have no right to compromise their interests by any act not clearly authorized by the act of incorporation. The preamble to the act, which is the best interpreter of the intent of the legislature, and shows its object, does not contemplate a power to enter into such a transaction. The question is not whether

the corporation made an express contract beyond its capacity, but whether an agent for them has made a contract beyond the powers of the corporation. An agent of a corporation, whether general or special, cannot do an act beyond the legal powers of the corporation. You cannot imply a power in an agent to do what the corporation itself could not have done. Where a public act of incorporation defines the powers of the corporation, or prohibits its doing certain things, every person is bound to know its powers, and whether an act done is authorized or not. Every company incorporated for a special purpose, being, itself, a special agent, an agent constituted by them must have a special authority, and all persons dealing with such agent must be presumed to know the extent of his authority. (*Hayden* v. *Middlesex Turnpike Company*, 10 *Mass. Rep.* 397. 403. *Sewall* J.) The delegation of authority by the company must be within its corporate powers. How does it appear that *D.* was the agent of the defendants? He must be appointed by deed, by an instrument under the corporate seal, or by some resolution or by-law of the company. No appointment under seal appears in this case. The act of incorporation gives the defendants power only to appoint agents to carry into effect the objects of the corporation, and no other; and the by-laws under which *D.* is supposed to derive his authority, did not authorize him to make this acceptance. But it is said that *D.* was in the practice of making such acceptances, and that the defendants have ratified them; but there is no evidence of a ratification of any acceptance not made on an actual deposit of goods; and the supposed adoption appears to have been made without a knowledge of the actual circumstances.

2. This bill was founded in an usurious agreement. It was originally made for the accommodation of *O. R.* and with a view to enable him to go into the city and raise money upon it. It comes within the principle decided by the court, in the case of *Dunham* v. *Dey*, (13 *Johns. Rep.* 40.) If the doctrine contended for on the part of the plaintiff is to prevail, the legislature might as well repeal the act against usury, for nothing can be easier than to evade it. The declaration of Lord *Mansfield*, in *Floyer* v. *Edwards*,

(*Cowp.* 114.) " That where the real truth is a loan of money, the wit of man cannot find a shift to take it out of the statute," would prove an idle saying. This was a mere accommodation bill, and after the bank had refused to discount it, *O. R.* carried it to a broker to raise money on it, at 2 1-2 per cent. per month, and the broker went to the plaintiff and got it discounted at 1 1-2 per cent. per month. The sale of a note in the market is a mere evasion of the statute, a mere cover for an usurious loan. (*Jones* v. *Hake,* 2 *Johns. Cas.* 60. *Wilkie* v. *Roosevelt,* 3 *Johns. Cas.* 66. 206.) Putting one's name on a note, for the mere purpose of rendering it negotiable, and to facilitate the usurious loan, is a shift and evasion of the law. But it is said, that the defendants cannot avail themselves of this subsequent usurious transaction with a third person, to avoid the payment of their acceptance. The defence may be made against any person who comes into court with impure hands, and tainted with usury. If the endorsement for an usurious loan is void, the holder can make no title through that endorsement. If the endorsee cannot recover against his endorser, on account of the usury, how can he maintain an action against the maker or acceptor? Though the bill were *bona fide* in its origin, yet if it was endorsed to the plaintiff for an usurious consideration, he can never recover from any party, for he must derive his title through that endorsement, which is illegal and void. The bill never existed as an effective and negotiable instrument, until it was passed to the plaintiff. An *accommodation* note or bill, has effective or legal existence only when it is transferred to a *bona fide* holder. If it is once established that the names appearing on the note were lent for accommodation, it makes no difference what is the number of endorsers, or whether the transaction assumes the shape of an acceptance or not. The form of the instrument, or the number of names on it, cannot change the real character of the transaction. The plaintiff is an usurious lender of money, not a purchaser in the market. The distinction set up, as to an innocent and *bona fide* holder, cannot avail him who is the usurer. If the instrument be originally usurious, or if the *bona fide* holder must derive his title

through an usurious endorsement, it is equally void against him.

SPENCER, J. delivered the opinion of the court. The grounds on which the defendants resist the payment of the bill, in this case, are, 1st. That *Noyes Darling*, the defendants' agent, exceeded his authority in accepting the bill. 2d. That the bill is usurious.

This case has been twice argued, and, the last time, by the direction of the court. The second argument has been confined to the last point, whether the bill was void for usury. The court entertained no doubts on the first point, and the second argument has removed all doubts upon the second.

(1) The defendants are a corporation, and had, it appears, duly constituted *Darling* their general agent. It has been strongly urged, that under the act incorporating this company, (sess. 36. ch. 150.) they could neither draw, nor accept bills of exchange. Their power is, undoubtedly, limited. They are required to employ their stock solely in advancing money, when required, on goods and articles manufactured within the *United States*, and the sales of such goods and articles on commission. The acceptance of a bill is an engagement to pay money; and the company may agree to pay or advance money, at a future day, and they may engage to do this by the acceptance of a bill.

The contract between *Herman Ruggles*, the drawer of the bill, and *Darling*, as agent to the defendants, is, that he will accept the bill, and that collateral security shall be given by *Ruggles* for the return or payment of it; but, as a consideration for the accommodation afforded by the acceptance of the bill, he was to place in the hands of the defendants' agent, 100 hogsheads of domestic distilled spirits for sale on commission, and as a further security for the acceptance. I perceive no objection arising from the act of incorporation, to the advance of money, or the acceptance of a bill, on an agreement to deposit goods or articles of domestic manufacture. The legislature have not inhibited this; nor have they required that the goods should be delivered to the company prior to their advancing money on them. Such a re-

quirement would be impolitic and embarrassing to the manufacturer and the company.

The point principally insisted on is, that the defendant exceeded his particular instructions, as regards the acceptance of this bill, the rum not having been, in fact, deposited. The by-laws of the corporation have been produced, and they certainly do not confer on the agent the power of accepting bills, on an expected delivery of goods. But it is proved that *Darling* was the general agent of the defendants, and that he was in the habit of accepting bills, which the company, afterwards, paid, under the like circumstances. It further appears, that the acceptance in question was entered in the books of the company in the usual manner of all other acceptances.

The distinction is well settled, between a general and a special agent. As to the former, the principal is responsible for the acts of the agent, when acting within the general scope of his authority, and the public cannot be supposed connusant of any private instructions from the principal to the agent; but where the agency is a special and temporary one, there the principal is not bound, if the agent exceeds his employment. In *Fenn* v. *Harrison*, (3 *Term Rep.* 760.) *Ashhurst*, J. takes the distinction stated; and he exemplifies it, by putting two cases. He says, if a person keeping livery stables, and having a horse to sell, direct his servant not to warrant, and the servant nevertheless warrants him, still the master would be liable on the warranty, because the servant was acting within the general scope of his authority. Again, he says, if the owner of a horse were to send a stranger to a fair, with express directions not to warrant the horse, and the latter acted contrary to the orders, the purchaser could only have recourse to the person who sold the horse, and the owner would not be liable on the warranty; because the servant was not acting within the scope of his employment. In *Gibson* v. *Colt* and others, (7 *Johns. Rep.* 393.) this court recognised the distinction between a special and general agent, as laid down in *Fenn* v. *Harrison*, to be founded on just and reasonable principles, with the observation, " that the limitation to the powers of a general and known agent, cannot be known, unless speci-

ally communicated, and third persons ought not to be affect- ed by any private instructions." The same principle was recognised by Lord *Kenyon*, in *Runquist* v. *Ditchell*, (3 *Esp. Rep.* 64.) and, again, by Lord *Ellenborough*, in *White- bread* v. *Tuckett*, (15 *East*, 407.) It makes no difference, that the defendants were a corporation; for it is settled, that they may be bound by the acts of their agents, in the same manner as private individuals.

I abstain from mentioning several incidental facts, which go to confirm the position, that the defendants considered and treated *Darling's* acts as binding on them.

2. The second point was not free from doubt, and, as has been observed, led to the re-argument of the cause. The doubt in the minds of some of the judges has been removed, by a more precise ascertainment of a fact; it was doubted, whe- ther *Oliver Ruggles*, the payee of the bill, was not a mere *dramatis persona*, and whether he could, after the accept- ance of the bill, have maintained a suit upon it. Upon a more careful examination of the case, we see no reason to doubt, that the bill, whilst in his hands, and before it was discounted by the plaintiff, at a higher rate than the legal interest, was a perfect and available bill, and that when it became due, he could have maintained an action upon it, against either of the defendants, or *Herman Ruggles*, the drawer. This appears to the court to be the true test, in distinguishing between a case, where the discount of a bill, at a higher premium than the legal rate of interest, will render the transaction legal, by considering it the purchase of a bill, already perfect and available to the party holding it, and where it will be illegal, as a usurious loan of money. The principle is too well settled to be questioned, that a bill, free from usury, in its concoction, may be sold at a dis- count, by allowing the purchaser to pay less for it, than it would amount to at the legal rate of interest, for the time the bill has to run. The reason is obvious; as the bill was free from usury, between the immediate parties to it, no af- ter transaction with another person can, as respects those parties, invalidate it. And I take it to be equally clear, that if a bill, or note, be made for the purpose of raising money upon it, and it is discounted at a higher premium than the

legal rate of interest, and where none of the parties whose names are on it, can, as between themselves, maintain a suit on the bill when it becomes mature, provided it had not been discounted, that then such discounting of the bill would be usurious, and the bill would be void. I have no doubt, that *Herman Ruggles* could, in no event, have maintained a suit on this bill. The contract between him and *Darling*, bound him either to deliver up the bill to be cancelled, long before it would become due by the terms of it, or to pay *Darling* the amount of the bill. And it would make no difference, as to the question of usury, that an attempt was made to get it discounted, at a legal rate of interest, by presenting it to a bank. Had it appeared that *Oliver Ruggles* had no interest in the bill, but had merely lent his name for the accommodation of *Herman Ruggles*, the court have no hesitation in saying, that the plaintiff's purchase of the bill would have been usurious, and that he could not have recovered upon it; because, until such purchase, the bill would have been mere waste paper, and it would have had no existence, or been available, until the plaintiff acquired his title, and that title, being contaminated and infecting the bill, would be invalid as against all the parties to it. (3 *Johns. Cas.* 69, 206. 2 *Johns. Cas.* 60.)

It has been said, that *Oliver Ruggles*, for aught that appears, was the holder of this bill in his own right, and could have maintained a suit to enforce its payment, when it came to maturity, against the acceptor and drawer, had it never been discounted by the plaintiff; and then it follows, that the drawer and acceptor, in a suit by the endorsee, have nothing to do with the consideration paid for the bill, by such endorsee to the drawer. They are bound to pay the bill; but, as respects the payee and first endorsee, if he be sued by his immediate endorser, it will be competent for him to show the real consideration paid; and if it be less than the face of the bill, and the legal interest for the time the bill had to run, then he can claim to have the difference deducted. (*Braman* v. *Hess*, 13 *Johns. Rep.* 52.)

Judgment for the plaintiff.

N. B. In the suit of *Munn* v. *Herman Ruggles*, the same judgment was entered. And in the suit of the same plaintiff against *Oliver Ruggles*, a judgment was given for 4,362 dollars and 75 cents, with interest from the 28th day of *April*, 1814.