SMITH'S EXECUTORS *v.* WYCKOFF and others.

A bank holding a promissory note made by L. and indorsed by P. for his accommodation, when the note fell due, to enable L. to pay it, discounted for him his own note ; to secure which L. delivered to the bank, another promissory note made by himself and indorsed by P., dated about a year prior to that time, and payable two years after date. [When this delivery took place, P. was dead, and the officers of the bank were aware of the fact. ] The original note was not protested, and was cancelled under this arrangement. *Held,* that neither P. or his executors, were ever liable upon the note thus negotiated after his death ; and that it was not a charge upon real estate, which P. after its date devised subject to the payment of all notes which he had endorsed for L.

A note indorsed for the accommodation of the maker, has no vitality, or existence as a contract, while it remains in his possession.

An indorsement on a blank sheet, intended for a note, authorizes the person to whom it is delivered, to write upon the sheet such note as he thinks proper.

All accommodation indorsements delivered to the principal debtors, clothe the latter with an *authority* to bind the indorsers in favor of persons who receive the securities in good faith on the credit of the indorsements.

Such authority is a mere naked *power,* revocable by the constituent.

All such powers are annulled by the death of the constituent. "The death of an accommodation indorser of a promissory note, before it is negotiated by the maker, annuls the latter's authority to issue the note as one binding upon the indorser."

A testator devised a farm to his son, subject to an annuity to the wife of the testator ; subject to the payment of two debts by name, which he had incurred, for his son ; also to all other debts which he had signed with or indorsed for his son ; subject further, to the payment of debts which his son owed to N. and O., children of the testator ; and also subject to the payment of all debts which the son owed to the testator : On a bill to sell the farm to satisfy the charges upon it ;

*Held,* 1. That the annuity to the widow was entitled to preference over all the others.

2. That the debts which the testator had incurred for his son were next to be paid.

3. That the son's debts to N. and O., and to the testator, were next to be paid without preference ; and that there should be no distinction, in favor of or against sureties, between debts of the son to the testator on which were sureties, and those wholly unsecured.

A charge in the will was, to pay " my bond for $1500, given to H. O. for money loaned for my son's use." There was no such bond, but the testator had delivered to H. O. a bond payable to M. S. for $1500, for the purpose described ; H. O. having made the loan for M. S. and received the interest as agent. *Held,* that the bond to M. S. was intended and was a valid charge under the devise ; and that the evidence was competent to show the misdescription.

May 7th ; October 16th, 1845.

The bill in this cause was filed by Edward H. Smith and Nathaniel Smith, executors of Edmund Smith deceased, on the 22d day of June, 1843, and was amended July 29, 1844. The amended bill set forth that Peter Wyckoff late of Bushwick in Kings county, in his lifetime, together with his son Lambert, made their joint and several promissory note, dated November 11th, 1837, and payable three years thereafter, to the order of Edmund Smith, for five thousand dollars, with interest half yearly. That the payee died in May, 1842, and that the note with interest from May 14, 1842, was wholly unpaid and was held by the complainants as his executors.

The bill further stated that Peter Wyckoff died in 1842, leaving a will dated April 8th, 1842, duly executed, and which is set forth at large in the bill. The only part of the will which was material in this suit, is in the following words, viz.

" Item. I give and devise to my son Lambert and to his heirs and assigns, the farm which I own in Bushwick near a place called the Wood Point, subject nevertheless to the payment of two hundred dollars per year in half yearly payments to my widow, during her widowhood, in lieu of her right of dower in said farm. Also subject to the payment of a note which I have signed for his use; in favor of Edmund Smith of the city of New York, for five thousand dollars. Also subject to the payment of my bond for fifteen hundred dollars, given to Henry Onderdonk, for money loaned for his use. Also subject to the payment of every other note or obligation for the payment of money, which I have signed with him or endorsed for him, for the payment of which I or my executors or administrators am or may be liable. Also subject to the payment of the debts which he owes to my son Nicholas, and my daughter Anne the widow of Adrian Onderdonk. And also subject to the payment of all the debts which he owes to me on his notes and obligations. Item. I give and bequeath to my daughter Anne the widow of Adrian Onderdonk, and Sarah the wife of John G. Van Cott, all my personal estate which is not already disposed of in this will, to be equally divided between them or their heirs, by my executors within two and a half years after my death, from which time and not before, my executors will charge interest for my said daughters, upon the debts which my

son Lambert owes to me. Item. I nominate and appoint as executors to this my will and testament, my son Nicholas and my friends Barnet and Jerom's Johnson, requesting them to settle my estate within two and a half years after my death."

The bill charged that the four children named in the will, were the only heirs of the testator; that his wife survived him; and that letters testamentary were granted to all the executors. That the farm devised to Lambert, contains about one hundred acres, was in his possession when the testator died, and had ever since been in his possession.

That the bond to Henry Onderdonk mentioned in the will, is due and unpaid. That the testator in his lifetime, indorsed for Lambert's accommodation, his note for $1600, which was duly protested when due, and is held by the Long Island Bank. That the testator in like manner indorsed for Lambert's accommodation his note for $1200, which was protested at its maturity, and is owned by Stephen Burkhalter. That the Merchants Exchange Bank of the city of New York, hold a note of Lambert's, dated December 13th, 1841, for six thousand dollars, payable two years after date and indorsed by the testator, which was protested at its maturity. That notice of the non-payment of all the foregoing notes was given in due form to charge the indorser. That as the complainants believe, there are no other creditors of the testator, whose debts were charged upon the farm devised to Lambert. That the creditors enumerated, have a lien upon the farm, prior to all others, except the widow's annuity. And that John Wyckoff has a judgment for $6000, against Lambert, regularly docketted; but which is subsequent and subordinate to all the charges imposed upon the farm by the will of Peter Wyckoff. The bill prayed that an account might be taken of the complainant's debt and of the other enumerated preferred debts, and of all other debts of the testator which were charged upon the farm; and that the farm or so much as should be necessary, might be sold or mortgaged, for the satisfaction of the debts which should appear upon such account to be due and owing; and for further or other relief.

The defendants named in the bill, were the executors, of Peter

Wyckoff, Lambert Wyckoff and wife, and all the creditors of Peter or Lambert heretofore mentioned.

The answer of the executors, set forth that the charge on the farm devised to Lambert, of a bond to Henry Onderdonk, was meant and intended by the testator to be a charge of a bond given to Margaret Schenck, for the same amount and for the same purpose as is described in the will. That the testator had given no bond to H. Onderdonk, but the latter loaned the money for which the bond to Schenck was given, and acted as her agent in relation to investing it, and in receiving the payment of interest. The answer further stated that the executors had paid the Schenck bond out of the personal estate of the testator, and claimed that they were entitled to stand in the obligee's place, and to enforce the charge of the bond against the farm devised to Lambert.

. The executors, as also Nicholas Wyckoff and Anne Onderdonk, insisted that the note held by the Merchants Exchange Bank was not a valid charge on the farm, because at the time of the testator's death, it was in the hands of Lambert, the maker, not negotiated ; and the indorsement being without consideration, the note as against the testator, never had vitality or legal inception. Also that the Merchants Exchange Bank knew of the testator's death, when they received the note.

N. Wyckoff and Mrs. Onderdonk set up their debts charged upon the farm by the will, and claimed priority with the complainants over all others ; and the executors also claimed for the debts due from Lambert to the testator, and that of such debts, those should be first paid for which the testator had no other security.

The Merchant's Exchange Bank put in an answer setting up their note referred to in the bill. The answer stated that on the 17th day of December, 1842, the bank held and owned a note for $5778 56, made by Lambert Wyckoff and indorsed by the testator, which matured on that day, and which the bank had discounted in the testator's lifetime. That on the same day, the bank, to enable Lambert to take up the note so matured, discounted his new note for the same amount, in the usual course of business, and received as collateral security for such new note, the note of $6000, described in the bill, made by Lambert, in-

dorsed by Peter, dated December 13th, 1841, and payable ten years after date. And that the proceeds of the discounted note were applied in payment of the note which fell due on the 17th of December. That nothing has ever been paid on Lambert's new note to the bank. That the note received as collateral security, was regularly protested for non payment on the 16th of December, 1843, and notice thereof given to Peter Wyckoff's executors. That one of the executors afterwards called at the bank, and after examining the note, in effect admitted its validity, and promised that it should be paid. The bank insisted that the note was a valid preferred charge against the farm in question.

John Wyckoff answered the bill, setting up his judgment against Lambert, and insisting that if the farm were sold to pay the testator's debts charged upon it, he ought to be substituted in place of the creditors so paid, against the personal estate of the testator.

The Long Island Bank and Stephen Burkhalter, respectively answered, setting up their claims as stated in the bill.

Lambert Wyckoff also put in an answer, presenting various points, but as he did not appear at the hearing, it is unnecessary to set them forth.

Testimony was taken in the suit, principally in reference to the descriptive error in the will, relative to the bond debt to Henry Onderdonk, and respecting the note held by the Merchant's Exchange Bank. The conclusion of the court on both points, appears in the opinion, and it is deemed needless to insert the testimony on which it was founded.

It appeared that Peter Wyckoff died on the 20th day of September, 1842, aged about seventy-four years. The material facts relative to the various debts set forth in the pleadings, were established by the evidence.

*Henry Nicoll,* for the complainants, and also for P. Wyckoff's executors, N. Wyckoff and Mrs. Onderdonk.

*J. M. Martin,* for the Merchant's Exchange Bank.

*J. L. Riker,* for John Wyckoff.

*B. D. Silliman,* for the Long Island Bank.

*R. H. Waller,* for S. Burkhalter.

*Mr. Nicoll,* in behalf of N. Wyckoff, Mrs. Onderdonk, and Peter Wyckoff's executors, made the following points.

I. The charge upon the premises devised to Lambert Wyckoff, of a bond for $1500 given to Henry Onderdonk, was meant and intended to be a charge of a bond given for the same amount and for the same purpose, by the testator to one Margaret Schenck. And as such will be sustained and recognized as binding upon the premises. (Powell on Devises, Vol. 2, p. 337, and cases cited ; 6 Vesey, 42 ; *Doe* v. *Roe,* 1 Wend. 541, and cases cited ; *Connolly* v. *Pardow,* 1 Paige, 291 ; *Thomas* v. *Maxwell,* 4 John. Ch. R. 609.)

II. The proof in the cause clearly shows that the testator in making this charge upon the farm, by accident and erroneously described the bond as having been executed to Henry Onderdonk when he meant and intended a bond made by him to Margaret Schenck ;

Because, 1. He had given no bond to Henry Onderdonk.

2d. Henry Onderdonk had loaned the money for which this bond was given, and had in relation to the investment of the money and the payment of the interest, acted as the agent of Margaret Schenck.

3d. H. Onderdonk was a relative of the family and intimate with the testator.

4th. The whole testimony on this point being uncontradicted, and not even an attempt to contradict having been made, the intention becomes *prima facie* apparent.

III. There is no evidence in the cause to authorize the presumption that the testator did not intend to charge the premises in question with the payment of this bond. The mere declaration of the testator that he was to pay this bond, made before the execution of the will, (even if proved) cannot be held to impair the solemn direction of his will. That the bond should be paid out of the premises devised to Lambert Wyckoff for whose benefit it was originally given.

IV. The executors of Peter Wyckoff having taken up and cancelled this bond out of the personal estate, are entitled to stand in the place of the obligee in the bond and to have the benefit of the charge upon the premises.

V. The note set forth in the answer of the defendant, the Merchant s Exchange Bank, is not a valid and subsisting charge upon the premises.

*Because* said note being at the time of the testator's death in the hands of Lambert Wyckoff the maker thereof, not negotiated and the endorsement thereof being without consideration, the same was without vitality or legal inception.

· Because by the death of the testator the implied authority given to Lambert to negotiate the same in such way as to make the testator liable thereupon, must be deemed to have been revoked. And lastly because the Merchant's Exchange Bank discounted the note with knowledge and notice of the testator's death. (Chitty on Bills, p. 391, 5th Lond Ed. ; 3 Espinasse, 108 ; *Lansing* v. *Gaine*, 2 Johns. R. 301 ; *Marvin* v. *McCollum*, 20 John. 289 ; *Munn* v. *Commission Company*, 15 John. 55 ; *Powell* v. *Waters*, 8 Cow. 686 ; *Downes* v. *Richardson*, 5 Barn. & Ald. 674 ; *Cutts* v. *Perkins*, 12 Mass. 206.)

VI. The premises being also charged with the payment of the debts which Lambert Wyckoff owed to his father upon his notes or obligations ; the same constitute a valid charge thereupon, and are entitled to be paid out of the proceeds of the sale thereof, according to the amounts admitted in the stipulation between the solicitors in the suit.

VII. The conceded fact that for several of the debts in the last point mentioned the testator held sureties, will not entitle such sureties to claim that the proceeds of the sale of the farm should be applied *pro rata* on all those debts, because in case of a deficiency the representatives of the testator would lose *pro tanto* the benefit of such suretyship ; such a result would defeat the plain and manifest intention of the testator, which was to benefit and protect the legatees of his personal estate. The charge is general and cannot be considered as a security given by the debtor or obtained by the creditor. It is simply a disposition made by the testator of his own property, with the sole object of doing equal

justice among his children. The law of suretyship, and of the surety's rights to have the benefit of all securities obtained for the debt for which he is liable, do not apply in such a case, and the court can only properly effectuate the intention of the testator, by declaring that the proceeds of the sale of the farm (after payment of the testator's own debts charged thereupon,) shall be first appropriated in payment of the debts of Lambert Wyckoff for which there is no security. ( *Wade* v. *Cooke*, 2 Sim. 155 ; *Richardson* v. *Wash. Bk.*, 3 Metcalf, 536 ; *Blackstone Bk.* v. *Hill*, 10 Pick. 129.

VIII. The term *debts* as used by the testator in his will, must be deemed and taken to mean the amount actually due from Lambert Wyckoff at the time of the testator's death. Interest therefore upon the principal of all said debts, is to be calculated up to that time.

*Mr. Martin*, for the Merchant's Exchange Bank made the following points.

I. Every note or obligation which Peter Wyckoff at the time of making his will or at his decease had signed with or endorsed for Lambert Wyckoff, and for which Peter then was or should thereafter become liable, or for which his executors or administrators should become liable, is a direct charge on his real estate devised to Lambert, and so made by the express terms of his will.

II. The note for $6000 was in existence at the time of the making of the last will of Peter Wyckoff, as one of the debts of the testator, and having been afterwards transferred to the bank before it became due, for a valuable consideration and in the ordinary course of its business, for the benefit of Lambert his son, and duly protested against his executors, they thereby as well as by their admission, became liable to pay it out of the personal assets of the testator, if not otherwise provided for. This brings it within the class of debts which the testator intended to charge on the real estate devised to his son Lambert Wyckoff, and it having been in existence at the time of the making of the will of Peter Wyckoff, it is to be presumed he had it in contemplation as one of the debts with the payment of which said real estate is charged. ( *Canfield* v. *Gibson*, 13 Martin's Louis. R. 142, 145 ; *Pinkerton*

v. *Bailey*, 8 Wend. 600; *Violett* v. *Patten*, 5 Cranch, 142; *Usher* v. *Dauncey*, 4 Campb. 97; *Mandeville* v. *Welch*, 5 Wheat. 277; 4 Mass. R. 45; Dougl. 513; 2 Paige, 509.)

III. An indorsement of a bill or note, implies an undertaking by the person making such indorsement, to every other person to whom the bill may afterwards be transferred, that the drawer shall pay the same at maturity. (Bailey on Bills, 148, and cases cited; *Russell* v. *Langstaffe*, Dougl. 514.)

IV. This holds true although the endorser die before transfer made, for if a bill or note be transferred after the death of any party to it, the party to whom it was transferred, will have a valid claim against the personal representatives of the deceased party. (Bailey on Bills, and cases cited, p. 145; *Perry* v. *Crammond*, 1 Wash. C. C. R. 100.)

V. If the transfer of the $6000 note were not valid as a legal indorsement, by reason of the previous death of the testator, yet for the purpose of establishing the equitable claim of the defendants to be paid the amount of the first note for $5778 56, and interest thereon, out of the real estate of said testator in the hands of his devisee and intended by the testator to be charged with the payment thereof, this court would consider the giving up of the first note and the depositing of the 6000 dollar one, as security for the payment of the debt and interest created by the first, as a mere substitution of one liability for another of the same class and description, both in existence at the same time, both identical in parties, and both at the time of their creation, a charge on the real estate of the party at whose request such substitution was made. Such being the facts, this court will not now permit such party to destroy his own security in the hands of innocent holders for value. (*Perry* v. *Crammond*, cited above.)

VI. If the defendants, had given up the first note indorsed by Peter Wyckoff under a mistake as to their rights, and had thereby lost all legal claim under the present note for $6000 against his estate, yet in equity, they would still have a right to come in as equitable creditors under Peter Wyckoff's will, which charged all liabilities which he had then incurred for the benefit of Lambert; no money having actually been paid on any of said notes either by Lambert or his father, and all of them having been in

existence at the time of making his will and at the time of his death. (*Bank of Sandusky* v. *Scoville*, 24 Wend. 115; *Passmore* v. *Mount*, 13 East, 517.)

VII. The creditors of the testator are entitled to priority in payment over legatees.

*Mr. Riker*, for John Wyckoff, submitted that in the event of a deficiency, his client as a surety of Lambert, was entitled to the equity of sureties in like cases. If the question were between Lambert and the residuary legatees, the former as devisee would prevail, because the personal estate is the primary fund for the payment of debts. The statute relative to mortgage debts, does not apply to a devise of lands subject to the payment of debts. There must be an express charge of the debts, to exonerate the personalty. The judgment creditor of Lambert is entitled *pro rata* with Nicholas Wyckoff and Mrs. Onderdonk, and has a right to turn them against the personal property of the testator, substituting them for those creditors of the testator who by force of the express charge exhaust the fund in question. The counsel cited *Wilder* v. *Keeler*, (3 Paige 168;) *Morris* v. *Mowatt*, (2 ibid. 586;) 2 Rev. Stat. 369, s. 32, 37; Will. on Exec. 1039, Chapt. 2, s. 1, 2; *Bootle* v. *Blundall*, (1 Merivale, 193;) 4 Kent's Comm. 421, note *d*.

THE ASSISTANT VICE-CHANCELLOR.—I will first examine the question between John Wyckoff and the parties adverse to him. The charges imposed by Peter Wyckoff on the farm devised to Lambert, may be thus classified.

1. The annuity to the widow of the testator; which all concede to have preference over the others.

2. Notes and obligations which the testator had signed with Lambert or indorsed for him. Two debts of this class were specified in the will.

3. Debts owing by Lambert to Nicholas and to Mrs. Onderdonk.

4. Debts which Lambert owed to the testator.

The question arises on the claim made by Lambert's sureties

to have the last class of debts placed upon an equal footing with the others.

There is no doubt of the equity of the sureties to have Lambert Wyckoff's property made liable in the first instance, to the payment of the debts for which they are obligated with him.

The point in dispute is, what interest in the farm devised to him, became his property ?

It is manifest from the will, that the testator did not intend to give any part of the farm to Lambert, leaving the obligations which he had incurred for Lambert, to be a burthen upon that portion of his estate which he gave to others. His language in effect is, that after these obligations are paid out of this farm, Lambert may have it subject to the other charges. The farm was the testator's. He had no idea of giving it to Lambert, and paying Lambert's debts also. And before Lambert can have the farm, either for his own use or to pay his own debts; it must exonerate the testator's estate from his liabilities incurred for Lambert's benefit.

I have no doubt but that the second class of charges is to be paid in full, before any of the debts belonging to the third or fourth classes.

In regard to these two classes of debts, I think the testator designed to place them on the same footing. It is true, the fourth class to be paid, constitutes a part of his personal estate which is given to other legatees, and in case of a deficiency, the personal estate, on this construction, will be abridged in favor of Nicholas Wyckoff and Mrs. Onderdonk. On the other hand, those creditors are his children, and one of them is a legatee of the personal estate; and there is no express discrimination made in the will between Lambert's debts to them, and those which he owed to the testator. It is not probable that the testator anticipated any deficiency; and the character of the two classes of demands, is not such as to enable the court to infer a preference in favor of one over the other, or of a portion of one class over the residue.

Therefore in respect of the fourth class of debts, the sureties of Lambert have no right to have the debts for which they are responsible, paid before the other debts which he owed to the testator; nor are the legatees of the personal estate entitled to have

Lambert's debts which are not secured, first paid, to the postponement of the surety debts.

Next, in reference to the charge in the will for the payment of the testator's bond, described as *given* to Henry Onderdonk for Lambert's use. There is no doubt but that by this description the testator intended his bond executed to Margaret Schenck, for $1500. There was no bond payable to Onderdonk. The bond to Schenck was for Lambert's use; was negotiated through her agent Onderdonk; delivered to him, and in that sense was *given* to him, and all the business in regard to the loan and the payment of interest, was transacted with him. The evidence is competent to show that the Schenck bond was intended.

The executors having paid the bond to Schenck, are entitled to be subrogated in her place, in order to enforce the charge for its payment imposed on the farm by the will.

The principal difficulty in the case, grows out of the claim of the Merchant's Exchange Bank, upon their note indorsed by the testator.

They have no right of action on the note which they held at the testator's death. That note was not protested when it became due, but was delivered up to the maker, on their receiving the note in question.

Peter Wyckoff died on the 20th day of September, 1842. On the 17th day of December following, Lambert W., in order to renew his note indorsed by Peter W., which then matured; gave his new note to the bank, and deposited as collateral security for its payment, the note in controversy, made by himself, and payable to and indorsed by the testator, Peter W. This note was dated December 13th, 1841, and was payable two years after date.

There is no doubt but that the claim of the bank is meritorious, and it will be exceedingly hard if in the renewal of Lambert's note, they have without intending it, lost the benefit of his father's liability for the debt. I approach the examination of the point, with an earnest desire to find the law of the case in their favor. It is nevertheless a pure legal question, upon ascertained facts; one which may not be swerved by any hardship, or any feeling of sympathy.

It must be assumed that the bank had notice of the death of

Peter Wyckoff, at or before the time they received the note. The cashier saw his death announced in the newspapers, which in the usual course of things, must have been within a day or two after it occurred. And it appears by the testimony of William Wyckoff, that pending the negotiation of the renewal of Lambert's note, the death of Peter W. was a subject of conversation between Lambert and the president of the bank.

This note indorsed by the testator, is to be treated as *an accommodation note*, while in the hands of Lambert Wyckoff. It was suggested that it should be inferred in favor of the bank, that the note after being indorsed, had been put into circulation, and had come to the hands of Lambert, for value, in the course of trade. But this inference cannot be upheld. Lambert being the principal debtor, the payer of the note; on its returning to him after being in circulation, it would be simply paid and extinguished. (*Bartrum* v. *Caddy*, 7 Ad. & E. 275; *Lazarus* v. *Cowie*, 2 Gale & Dav. 407.)

One legal consequence of the fact that this was an accommodation note while it remained in Lambert's possession, is that it had no vitality or existence as a contract, until he parted with it to the Merchant's Exchange Bank.

The test of a valid note, is the right of the holder to maintain an action upon it against the parties to it, provided it were due. (*Munn* v. *The Commission Company*, 15 Johns. 44, 55, per Spencer, J.; *Powell* v. *Waters*, 17 ibid. 176 : S. C. 8 Cowen, 669, 686, 697, 705, per Jones, Chancellor, and Colden and Spencer, Senators; *Marvin* v. *McCullum*, 20 Johns. 288; *Downes* v. *Richardson*, 5 B. & Ald. 674.) In the case last cited, three persons joined in making an accommodation bill, as drawer, acceptor and first indorser. It was afterwards altered in its date, and was then issued to H. for value, without being stamped anew. The court decided that no fresh stamp was necessary; the bill having been altered before it was issued, in point of law. Abbott, Ch. J. said it first became a bill of exchange, when it was issued to H. for a valuable consideration. And Best, J. likened it to a bond, in form, perfect before delivery. He said the bill was perfect in form, but did not constitute a valid contract between the parties.

The same principle is established in *Abrahams* v. *Skinner*, (12 Ad. & El. 763,) which will be more fully stated hereafter.

It is clear therefore, that up to the 17th of December, 1842, while the note was held by Lambert Wyckoff, neither Peter Wyckoff or his estate, were liable or obligated by reason of his indorsement on the note.

What then was the effect of the transfer to the bank ? Did it give vitality to the indorsement as against the estate of Peter Wyckoff, and make it a liability which his executors might be compelled to pay ?

This depends upon the authority conferred by an accommodation acceptance or indorsement; or which third persons have a right to infer, from such acceptance or indorsement.

Where an indorser commits a promissory note to the maker, with a blank for its date ; the act authorizes the maker to fill it up with what date he pleases. (*Cruchley* v. *Clarance*, 2 M. & S. 90 ; *Mitchell* v. *Culver*, 7 Cowen, 336, and *Mechanics Bank* v. *Schuyler*, ibid. 337, note ; 1 Bell's Comm. Laws of Scotland, 391.)

And where one signs his name on an entire blank note or bill, and delivers it to another ; he thereby authorizes the latter to write upon it a note or bill, for any sum and in any terms, that he chooses to insert. (*Russel* v. *Langstaffe*, Dougl. 514 ; *Violett* v. *Patton*, 5 Cranch, 142 ; *Putnam* v. *Sullivan*, 4 Mass. 45.) It is a general authority, a *carte blanche*, or letter of credit to an unlimited extent.

I might refer to many other adjudged cases, where the power implied, was more or less general. They all proceed upon the principle of a *power or authority*, inferred from the act of signing or indorsing, to bind the party in favor of any person who may receive the paper in good faith, on the credit of his name.

So in this case, Peter Wyckoff's indorsement of Lambert's note, (already filled up, as it is supposed,) was an authority to Lambert to make him liable for its amount, in favor of any party to whom Lambert might negotiate the note.

Was this authority any thing more than a naked power, and as such revoked or terminated by Peter's death ? Was it in any

respect different from a letter of attorney, authorizing one to sign or indorse a note at a future day ?

The death of a party is in general, a revocation of all authorities granted by him, whether express or implied. And if there were a revocation in this instance, by the death of the testator ; the bank, having notice of his death, was legally informed of the revocation.

In regard to checks on bankers, it is considered that the death of the drawer, is a countermand of the authority of the banker to pay.   (Chitty on Bills, 307 ; 7th Am. Ed. 1830.)

In *Tate* v. *Hibbert*, (2 Ves. jr. 112, 118,) where this was conceded by the Chancellor, he inclined to think that payment would not be recalled, if the holder of the check received the amount of it before the banker was apprised of the death of the drawer.

The authority in the case of checks, is almost universally coupled with an interest, and would seem to be less revocable than the power inferred by the indorsement of accommodation bills or notes,

So far as I have been able to discover, there is no adjudged case, nor any treatise, which holds such a power as this to be irrevocable by the death of the constituent. At the same time I should add, that there is no express sanction for the opinion that it is terminated by death.

Many of the authorities however proceed upon the assumption that it is thus terminated ; or strongly imply that conclusion.

. Thus in *Abel* v. *Sutton*, (3 Esp. R. 108,) where Lord Kenyon held that if a bill indorsed by a firm is sent into circulation after the dissolution of the partnership, all the partners must join in the indorsement ; he said, " I even doubt much if an indorsement were actually made on a bill or note before the dissolution, but the bill or note was not sent into the world till afterwards, that such indorsement would be valid."

In *Lansing* v. *Gaine and Ten Eyck*, (2 J. R. 301,) it was held by Chief Justice Kent, that a note signed by a firm, had no force while in their possession, and if not issued till after the dissolution of the partnership, it would not bind the partners who did not assent to its being issued.

In *Usher* v. *Dauncey*, (4 Campb. 97,) F. a member of a firm

drew a bill in blank in the name of the firm, payable to their or-
der, indorsed it in their name, and delivered it to a clerk to
be filled up and used as the exigencies of the partnership might
require. F. died, and soon after, the bill was filled up by the
clerk and dated by him prior to the death of F., and it subse-
quently came to the hands of indorsees for value, in good faith.
The surviving partners being sued as drawers, insisted that after
the death of F. the blank to which he had affixed the partner-
ship name, became a nullity, on the ground that the power he
gave to fill it up as a bill of exchange, expired with him. But
Lord Ellenborough held that the power must be considered to
emanate from the partnership, not from the individual partner;
and that therefore after his death, the bill might still be filled up
*so as to bind the survivors.* The King's Bench sustained the
ruling of the Chief Justice at *Nisi Prius.*

It is evident that in *Usher* v. *Dauncey,* no one thought of hold-
ing the deceased partner liable by reason of his use of the name of
the firm. The whole contest between the parties, assumed that
as to him the authority expired upon his death. And it appears
to have been a conceded point, that if the power implied, was
merely that of the partner who signed, it terminated with his
existence. But the court held it to be a power granted by the
whole firm, which though revoked as to F. by his death, con-
tinued unimpaired as to the survivors, and that they were liable
precisely as if they had originally drawn and indorsed the bill
without F.

The cases of *Downes* v. *Richardson,* (5 B. & A. 674,) and
*Abrahams* v. *Skinner,* (12 A. & E. 763,) are analogous in prin-
ciple.

There is another class of cases, of which some were cited by
the counsel for the bank, which I think in effect sustain the posi-
tion that the authority implied by the indorsement, in general,
terminates with the life of the party. They all proceed on the
familiar principle, that a power coupled with an interest, is not
revocable.

Thus Judge Washington said (in *Perry* v. *Crammond,* 1
Wash., C. C. R. 100,) that a person with whom certain bills of
exchange had been deposited by the drawers for the purpose of

being filled up with a date and the name of a drawer, and which had been used to raise money for their benefit; might after the death of the drawers, accept the bills, insert a date prior to that event, and deliver them to one who had previously made advances on the faith of the bills. In that case, the bills at the death of the drawers, were in the agent's hands unused, and they were in fact issued afterwards for a precedent debt, to parties who knew of the death of the drawers; and it was decided that the holders could not recover against the representatives of the drawers.

The decision, as well as the *dictum* of the learned Judge, appear to me to be a clear concession, that those bills could not be put into circulation after the death of the drawers, except upon a previous advance, so as to be available to any holder who was aware of their death, and of the fact that they were issued after that event.

In *Cutts* v. *Perkins*, (12 Mass. 206, 210,) the drawer of a bill delivered it to the payee for value, and died before it was accepted. The court expressed their opinion that the bill being valid against the drawer in the hands of the payee, the acceptance after the drawer's death was binding.—And they say that where the authority is coupled with an interest, the death of the drawer will not be a revocation of the request of the drawee to accept. The case was nevertheless decided on another point.

The case of *Billing* v. *Devaux*, (4 Scott's New Rep. 175—, S. C. 5 Lond. Jur. R. 1182,) sustains the opinion put forth in *Cutts* v. *Perkins*. Coltman, J. in substance gives as one reason for the decision, that the bill having been put in circulation, the death of the drawer could not affect it.

The principle, differently applied, is also found in *Peyton* v. *Hallett*, (1 Caines, 363, 379.) And see *Simon* v. *Lloyd*, (2 Crompt. M. & R. 187.)

In *Hammonds* v. *Barclay*, (2 East, 227,) a factor accepted bills, on the strength of the consignment to him of a ship for sale. The ship came, but it was sent by the executors of the drawer, which the factor knew. He sold the ship and applied the proceeds to his acceptances, retaining for such as had not matured; and this was upheld.—But see *Copland* v. *Stein*, (8 T. R. 208.)

An executor may sign the name of his testator as drawer, to a blank or unsigned bill, (meaning acceptance,) found in the testator's repositories; and may raise diligence upon it. And such a bill may be signed by the drawer, after the death or bankruptcy of the acceptor, or at any time before producing in judgment. (1 Bell's Comm. 391, 395, 6.) This of course assumes that the bill is held by the decedent for value.

The cases to which I have referred, are all consistent, and all appear to concede distinctly, or by implication ; that the authority to put a bill or note into circulation, inferred by signing it, is revoked if the party die before it is issued. When it is, or of right should be, in the hands of one who has acquired an interest in it, the rule does not apply, because the paper is then issued, and the authority has been exercised.

It is contended that the note must be held to have been issued, *by relation*, at the time of its date.

In aid of this point, it is said a note is presumed to have been made, at the time when it purports to have been made.

There is no doubt of this, but here the proof is conclusive that it was not *made*, in the legal sense, until December, 1842, and the presumption relied upon is overcome.

The counsel for the bank referred to *Usher* v. *Dauncey*, before cited, as an authority for giving effect to the note by relation. I have already commented on the case, and need not speak of it farther.

The case of *Snaith* v. *Mingay*, (1 M. & S. 87,) is the strongest one in favor of the bank, that I have met with on this point of relation. There the question was upon copper-plate impressions of four bills of exchange, signed as drawers, in blank in Ireland, by a firm doing business there, and transmitted to one Wallace in London, to be filled up and used for his accommodation. The latter made use of the bills accordingly. They had been stamped with an Irish stamp, when the drawers signed. It was insisted that the bills were drawn in England, and being inland bills, required an English stamp. The court decided that the bills were drawn in Ireland. They put it upon the ground of relation, when the bills became perfect, to the time when they were signed.

Bayley J. says if the drawer had died while the bill was on its passage, and afterwards the blanks had been filled up and the bill *negotiated to an innocent indorsee;* he should think the representatives of the drawer would have been liable.

Scarlett, *arguendo,* contended that the signature of the firm as drawers, was in the nature of a power of attorney to Wallace to draw bills in their names.

It may be observed of *Snaith* v. *Mingay,* that the relation, upon which the court acted, was one *of place,* and not *of time.* The illustration of Bayley J. was by reference to a relation in point of time. The question was simply, *where* were the bills issued ? They acquired vitality for the first time in London, but the drawers residing in Ireland, having actually signed the bills there, and Ireland being the place where they were to be notified of their non-payment, and called upon to pay them, it was held that they were foreign bills. It would have been no defence by the drawers against a claim for damages on non-payment, to have shown that the bills were first issued in London, and therefore were inland bills. The whole question was one of locality, in reference to the revenue of the government from stamps. This appears by *Crutchley* v. *Mann,* 5 Taunt. 529, where the same question arose upon a bill drawn in Jamaica, upon a stamp of that island, with a blank for the payee's name, and transmitted to England, where a *bona fide* holder inserted his own name as payee ; and it was decided that an English stamp was not necessary. (See *Downes* v. *Richardson, ubi supra.*)

This is further shown by the case of *Abrahams* v. *Skinner,* (12 Ad. & E. 763.) There in June, 1833, the defendant gave a blank acceptance on a proper stamp. In November following, the die of that stamp was discontinued, and a new stamp used pursuant to a statute. In 1835, a bill was drawn upon the blank acceptance, without a fresh stamp. It was held that the bill could not be considered as existing by relation from the time of the acceptance; and therefore it was not properly stamped. Lord Denman said, "Upon the day when the old stamps were discontinued, the bill in question had, in fact, no existence."

The case of *Snaith* v. *Mingay,* was relied upon, and the Chief Justice, without expressing any opinion upon the de-

cision, drew a distinction between that and the case in hand, founded on a difference in drawing a blank bill, and in accepting one in blank.

Neither case having the force of authority here, I am at liberty to say what Lord Denman evidently felt, that the ground of *relation to the time of signing*, which was adopted in *Snaith* v. *Mingay*, was inconsistent with the principle that a bill has no legal existence before it is issued. And *Abrahams* v. *Stephens*, in effect, overrules *Snaith* v. *Mingay*.

*Pasmore* v. *North*, (13 East, 517,) was also cited by the counsel for the Bank. North on the 4th of May, drew a bill at 65 days, and dated it on the 11th of May, in favor of Totty, who on the 5th of May, indorsed it to Pasmore for a valuable consideration. It was a business bill, given for goods, part of which had been delivered, and a part were to be delivered subsequently. Totty was accidentally killed on the 5th of May, and North refused to pay the bill on the ground that Totty could not transfer it prior to the day of its date. The court held that the transfer was valid. The counsel for the defendant there argued for a *relation forward*, insisting that the indorsement was with reference to the time of the date, at which time only the bill could be deemed as issued.

It appears by *Pasmore* v. *North*, that the date of a bill is not material, except to fix the time at which it is payable. And when it is said that a bill drawn for a blank sum, or an accommodation bill, when filled or issued, takes effect as of its date, or relates to that period, it is said in reference to the time and terms prescribed for its payment, and its intermediate transfers.

The authorities appear to be insuperable against giving effect to the note of Peter Wyckoff, upon this doctrine of relation.

Partnership signatures placed upon a bill or note, before dissolution, or as of a date prior to that event, which is issued subsequently, furnish an analogous case; one which is of more frequent occurrence than that of the death of an indorser before issuance, and equally likely to be productive of hardship to purchasers of notes and bills.

Yet it is clearly settled, that no such relation to the date of the paper, is permitted in the instance of partners. (*Lansing* v. *Gaine* and *Abel* v. *Sutton, ubi supra ;* Story on Part. 248.)

So the relation is not held, in regard to the date, under the stamp acts in England. (*Downes* v. *Richardson,* and *Abrahams* v. *Stephens,* before cited.) The cases of *Perry* v. *Crammond,* and *Usher* v. *Dauncey,* are entirely consistent with these. And such a relation is utterly at war with the great principle, that a note or bill is not *issued,* until it is delivered to a party who can maintain an action upon it, and until then it has no vitality or legal existence.

The doctrine of *escrow,* technically appertains to instruments under seal; but its principle if applied to this case, will not sustain the indorsement. There was no *conditional delivery* of this note, no specified event upon the happening of which it was to become available or absolute.

While a bill which is already issued, is in the hands of the drawee, he may revoke his acceptance of it after he has written it upon the bill, at any time before the bill is delivered to the holder, or the fact of his acceptance is communicated to the holder. (*Cox* v. *Troy,* 5 B. & Ald. 474—*Pothier, Traité du Contrat De Change, d.* 44; P. 1, Ch. 3, S. 3.)

An accommodation indorser has or should have as much control over his signature, while the paper remains in the hands of the person to whom he has lent his name and who is acting in respect of the note, by force of his authority, and in effect, as his agent.

My conclusion is, that the death of Peter Wyckoff was a revocation of the power which by his indorsement of the note in dispute, he had conferred upon Lambert Wyckoff; and that Lambert had no authority to issue the note after his death, so as to make it an obligation of the testator.

In all that I have said, and in my conclusion, I do not intend to go a step beyond this case, in which the bank receiving the note, although they paid a full consideration, took it from the makers with notice of the death of the accommodation indorser. They received it in good faith, for value, *with notice of the defect.* But for the latter circumstance, their claim would have been of a totally different character.

In regard to the manifest intention of the testator to make himself liable by means of this indorsement—the intention is

no more obvious than it would have been, if in December, 1841, he had given to Lambert a power of attorney authorizing him in December, 1842, to indorse his note for $6000. No one would doubt but that he expected to become liable for the $6000; yet no one would imagine that after his death, Lambert could make him liable by executing the power.

It is moreover unsafe to speculate on the views and expectations of a man in furnishing blank indorsements to his son. It is more probable that he expects to have a voice and influence in their use, than that he means to subject himself and his family to their consequences for an indefinite period, and without reference to his life or death.

The counsel for the bank argued that this was a note in existence at the date of the will, and therefore a direct charge upon the real estate of the testator by the express terms of the will.

The charge on the farm is only for debts signed with or indorsed for Lambert, *for the payment of which the testator or his executors then was, or might be liable.* Now this note was not a debt for which the testator was then liable. It had not been issued, and legally was not in existence. And in my view of it, neither he or his executors became liable for it.

If the testator had in view Lambert's debt to the bank, when he made his will, it was not this note, but the one then held by the bank which he intended to make a charge, and from the latter his estate was discharged.

As to the one being a substitution for the other, the bank doubtless so intended it, but as I am compelled to adjudge the law to be, such a substitution could not be made after the testator's death.

Another point was, that the court will not permit Lambert to avoid this charge on his real estate, he having procured the substitution. But this does not apply to the issue. The farm is not Lambert's property until the charges imposed on it by the testator are paid. After those are provided for, the debt of the bank is unquestionably valid against Lambert's interest in the farm.

The recognition of the note by one of the executors, was not much pressed. It can not be used to sustain the claim upon the

note, because there is no evidence that it was made with any knowledge or information, that the bank received the note from the maker, after the death of the testator. This reason suffices, without referring to any others. (See *Tebbets* v. *Dowd*, 23 Wend. 397 ; *Cayuga County Bank* v. *Bennet*, 5 Hill, 236 ; *Same* v. *Dill*, 5 ibid. 403.)

There must be a decree accordingly, for taking an account of the various charges, and for a sale or mortgage of the farm, to the end that they may be paid.